Unit 166 lodges three B., B-Sep., B-Sep., A-P, D-P, X, Yro-IR. Good morning. I'd like to reserve five minutes for rebuttal, if I may. My name is Jeremy Cawthorn. I'm from Chattanooga, and I represent Yolanda Dionne Wade in this matter. It's an employment discrimination lawsuit. We are appealing the grant of summary judgment on all counts, and those counts were hostile work environment through sexual harassment, hostile work environment through racial harassment, hostile work environment through religious harassment, hostile work environment through the aggregation of the aforementioned three categories, retaliation under Title VII and under retaliation under Tennessee common law, and that's where we are. I'm here to implore this court to provide a much-needed course correction for the Tennessee District Courts with respect to employment lawsuits and summary judgment in particular. Through the interpretation of a variety of cases focusing mostly with the District Court, Title VII is fast becoming a mirage rather than a useful tool to curtail harassment. The reality is that as our society grows more attuned to issues with harassment, that we're not going to have the same type of smoking gun explicit issues that we've had in the past. They're going to become more veiled, more complex, and it's going to require the jury to hear all the facts and make a determination of whether those facts violate Title VII or do not. In preparing for today, I came across a study from a Baker Donaldson attorney who did a review over the different District Court judges in Tennessee's and the frequency with which summary judgment is granted. The numbers vary by judge, but they are high. When we take those percentages and we juxtapose that against what is the baseline fundamental concepts under Title VII... Is any of that in the record, or is any of that a case that says that you look at how often judges grant summary judgment in making some legal determination? No, Your Honor, it's not, and I did not put it in the record. What I'm merely suggesting is that a review of the case law demonstrates the frequency with which summary judgment is granted. I did not deem it appropriate to put it into the record because it's not a legal determination. What it is... There's nothing that... I mean, we don't know that there is any baseline, whether judges should grant summary judgment 10% of the time or 90% of the time. We review them case by case on appeal, and at least statistically, for the whole country, most times district judges are upheld, but it doesn't mean in any given case that we do anything other than look at the law. So let me cut to the chase here, at least for me, not necessarily for my colleagues. In essence, you certainly have a significant amount of evidence that the protagonist here, a genuine issue of material fact, is there being a jerk. The question is, how do you fit that into any of the three categories of race, sex, religion, passing the retaliation? And at least for me, because of the nature of the very small office, to me, you have a lot of trouble with sex and religion, so at least I'd like to ask you to focus on race, where, as I read the brief, you said that the district judge focused only on the nicknames issue and didn't look at other factors as well. And so I'm asking, what were the other factors that would give you a racially hostile environment? The only thing I saw was Clark's reaction, you said she overheard Clark laughing at the same thing. Are there other things you'd focus on? Yes, Your Honor, and so my argument to that effect is that when we have a clear nexus between race and harassment, that that provides our anchor. And we then begin to view the other issues, and a jury could reasonably determine those are attributable to race. Further augmenting the help made... Let me stop there. When you say the others, so that the bra and underwear incidents would be in some way attributable to race? Yes, Your Honor. If there is a distinct racial component, racial harassment does not have to be explicitly racial in each context. What we have in this circumstance is a targeted... Most of those cases are where you have a comparator. That is, you're treating a black person badly without using racial terms when you're not treating a comparable white person badly, right? Isn't that what most of those cases are? Most of those cases, and the comparable evidence is something that unfortunately in our situation is unavailable. It was a three-person office. The manager was a white female, and the two supporting personnel were African-American females. And what we have ultimately here is that there were other issues with race. There were... My client testified, and it should be in the record, that her boss instructed her to only provide certain white applicants to certain clients. This was a temporary staffing agency. What we also have is the defendant, Gross, made bigoted statements about Hispanics. There was a client employee of APS that used racial slurs, and there were a series of complaints regarding this individual's harassment. That particular client was NPW. It accounted for, if memory serves correctly, 66-plus percent of the gross revenue of this APS Chattanooga office. That was all swept under the rug. There was a complaint levied when my client's coworker was told that she was an incompetent little black girl. There was a complaint made. There was some response... By Akins to... By Matt, who was an employee of NPW, to Akins, and my client overheard that comment. That's... Okay, but so that's not an automation... Not an automation. That's a customer acting in that way. For a time, they permitted Ms. Akins and Ms. Wade not to directly interact with that individual. But ultimately, Renee Clark said, if we have to lose you to Ms. Akins in order to keep NPW, that's what we're going to do. With that... She's not a plaintiff, right? That's correct. Ms. Akins is not a plaintiff. She received a severance and all that, but that's a different issue. Growing out of this racially hostile environment, we then have our anchor. And it is up to the jury to determine whether or not those other issues are attributable to her race. I think here, this was a woman of strong faith. This was an African American woman, and she was obviously a woman. Defendant Gross targeted each of those components of her as a person. So, with that being the case, hostile work environment is supposed to be rarely granted. That's the O'Shea case. Summary judgment is supposed to be rarely granted in hostile work environment cases. It's a question of fact. Did this have the scope, the width, the breadth to be a hostile work environment? And those are issues that juries are supposed to resolve. I think there is a... How do you juxtapose that against the cases that specifically address hostile environments based on race, sex, and religion, and they at least seemingly involve situations that are a lot more outrageous than what the facts are in this case? Is not a district judge supposed to follow those cases? Well, I believe that there is an increasing number of bad district court opinions which have infiltrated the summary judgment grants. I'm not talking about following another district court decision. I'm talking about circuit decisions. Yes, Your Honor, and this is the challenge with that, is that the pronouncement is that these are case-by-case evaluations. We will never have cases that are on all fours. And I also believe that the operative question is whether or not a jury could return a verdict. I believe here that judges, particularly district court judges in Tennessee, are beginning to usurp that role. I thought... Your time has expired unless you want to eat into your rebuttal time if you can. I'll be back in a second. Thank you, Your Honor. Thank you. May it please the Court, Your Honor. Good morning. J.K. Sims here along with Jennifer Langford on behalf of the Corporate Defendant Automation Personnel Services and Tammy Gross. In this case, the district court properly found that the record, taken as a whole, could not lead a rational trier of fact to find that a reasonable person would regard this work environment to be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. That's the standard from Harris, from the United States Supreme Court. Here, plaintiff would have the court do what the Supreme Court expressly declined to do in Harris, which is the court noted that it was taking a middle path at that time between making actionable any conduct that is merely offensive and requiring conduct to cause tangible psychological injury, which had been the law before Harris. Plaintiff would have the court find actionable any conduct that is merely subjectively offensive and plaintiff would have the court ignore the objective test in determining whether a work environment is hostile. The district court's opinion in this case noted that plaintiff was exposed to insensitive and an environment which made her feel uncomfortable, but it did not rise to the level of a hostile work environment based on the well-established body of law in this arena. There indeed, Judge Keeg, are cases that we've cited where a summary judgment was affirmed on much more egregious circumstances. The... And that's it, isn't it? That's the crux of it. It's a matter of degree. It seems that the trial court, and perhaps even your writing, if I understood it in the way you intended, you don't disagree that there was insensitive, antisocial, problematic behavior, but your point is mainly it does not amount to that objective level of egregiousness that Harris and other cases rely upon or requires that we now rely upon. That's correct, Judge Pearson. What I'd say is that we have this body of law and nearly every case says that Title VII is not a general civility code, that you can't make... Because something may be insensitive, that doesn't necessarily make it a hostile work environment. So that's why we've developed this body of law that says what does amount to that level? And here, the plaintiff failed to establish a prima facie case of hostile work environment. While arguably insensitive, it did not rise to that level. And that is our argument, and what the district court found as well. Can you indulge me just a moment more? You heard opposing counsel speak about what I'll call the race-plus argument. Race is this bedrock, and then when you consider the other behaviors that went on, whether regarding sex or religion, when you pull them together, they make an effective cumulative theory. Your position on that? The plaintiff is relying upon... and cites a number of cases there for that. And I think most... Take the Hafford case that plaintiff cites, where here you had, in that instance, you had race and religion claims, racial and religious discrimination, where the plaintiff was an African-American and a Muslim. And there were a number of racial slurs combined with religious slurs to where you could buoy... Clearly, most of the comments were racial in tone, but there were also religious comments. And so in the Hafford case, they said, you've got a religious claim here, you've got a racial claim here. Because of the religious claim, we think you can buoy those and bring them together. Because there was a connection in the comments with the racial and the religious. Here, there's no connection whatsoever. Even taking all of the allegations is true. With respect to the racial claim, and I would disagree that the court only discussed the issue of the discussion of the novel The Help, where the allegation is that character names were given because Ms. Gross felt that Ms. Wade reminded her of someone from the book that she read. The court didn't just discuss that. The court also discussed the allegation of a comment made by Ms. Gross that's in the complaint about Hispanics. Also discussed the issue with the employee who was not an employee of Automation Personnel and would note that Automation Personnel told that individual's supervisor and he was terminated. That's in the record. So the court didn't just focus on the discussion of The Help. But here, compare the Hafford case, and can you buoy the cases? Do say that. If there's enough there to where you can latch on to something that would connect them, but there's nothing connecting them. And I think Judge Carter and the district court analyzed that very well in the memorandum. So you don't have that. The other case relied upon as far as looking at the totality of the circumstances is the Jackson v. Quonex case. Those facts are not only were the facts of the case egregious, frankly the district court's opinion in some of the evidence that was excluded, that case is not remotely similar to what we have in this case. And I would note for your honors that Judge Collier, the distinguishing thing from Jackson and Hafford is the district court did look at the totality of the circumstances, cumulatively, and said combine it all. There is not enough here for a hostile work environment. And particularly, of course, I noted the standard in Harris, but the fact that while the plaintiff may have found this subjectively offensive, it doesn't pass the objective test that is required to prove a hostile working environment. Isn't it more than just finding it offensive in the sense that an objective person could find it offensive just as much, but not sufficiently severe to alter the conditions? That's correct. And create an abusive working environment, which is the Harris standard. Let me ask you this, this may be off the point, but I know Aikens resigned. Did I miss in the allegations here whether Wade, in fact, resigned at a particular point in time or what happened to her? Wade, I'm sorry, the plaintiff voluntarily resigned her employment. She was not terminated. The record is clear that not only was she not terminated, she was never threatened. After Aikens or how long? It was after Aikens, shortly after Ms. Aikens resigned. And that does, I think, that is worth noting, I think given where we are, to talk about the adverse employment action because here there wasn't a termination. So the only arguable, and what the plaintiff would rely upon, would be the one-hour shift change. Is that a sufficient adverse employment action? And there's not a direct claim of constructive discharge? There is a claim of constructive discharge. On that claim, would it not be more plausible to aggregate these different, let's call them indignities, because for a constructive discharge you don't have to have a particular tagline for it, do you, in the sense that on account of all of these things a reasonable person would have resigned? In other words, would a reasonable person have found the working conditions intolerable such that they would resign? That would be the standard here. In some sense that's a tougher standard than just a straight discrimination. Based on the facts of this case, what is not disputed is that when the plaintiff called to the attention of Renee Clark, the regional manager, basically what is contained in the complaint, her allegations, Ms. Wade testified that the inappropriate behavior stopped. And so what the plaintiff would be left with she mentioned staring through the window at her on an occasion. She mentioned leaving the back door of the facility unlocked, the alarm off, but as the district court noted in the opinion that doesn't really make sense because she wasn't the first one there so it didn't put her at risk. It didn't affect her in any way. So the district court, in discussing the constructive discharge allegations in this case, noted that because the one-hour shift change is insufficient and leaving the alarm off or back door open would not create intolerable conditions, especially when Gross left the alarm off only after Wade left and it was a co-worker who discovered it, you don't have intolerable working conditions here. And if there's reliance upon the fact that her shift had been changed by one hour, the plaintiff's testimony is that she never missed her family devotional, which is the issue as far as why she was upset that that had occurred. So this is not a case where there's, if you compare the cases where constructive discharge is found, it would not be reasonable to conclude in this case that the working conditions were intolerable. I do feel like I should touch on the same-sex sexual harassment allegations. The standard for that is clear, and Oncoli established three ways that that can be shown. The first is credible evidence that the harasser was homosexual. The second is that the harasser was motivated by a gender hostility to the presence of women in the workplace. And third would be the comparative evidence standard. The only thing that plaintiff relies upon in terms of evidence of Ms. Gross being homosexual is her belief that Ms. Gross may have been sexually attracted to her, based on a discussion that she came to that conclusion. She said in her deposition, I believe we got to a place, it got to a point, where her behavior got out of order in the things she was saying about her friend's lesbian relationship. It led me to believe that that really was her issue. The discussions about the undergarments, I would say, comes closer to ordinary workplace discussions in an all-female environment that does not rise to the level. I do want to clarify, and plaintiffs appellate in their brief notes that both Wade and Eakins testified that they believed that Gross was homosexual. Eakins testified that she couldn't say whether she had sexual motivation or not. There is no evidence that Gross might be a lesbian or bisexual and thus had a sexual motivation. Let me take you back a minute to the religion part. As I understood your argument, they simply expanded the amount of hours, and so somebody had to come early and somebody had to stay late. Is there any allegation or evidence that that was pretextual in terms of expanding the office hours? Whether that's an allegation, I don't know that the argument is that it was pretextual, but the argument is that they knew that this was important to her, the defendants did, her family devotional, and that after she complained, they quickly made that decision to do that. The record is clear that you had two employees. There were eight to five shifts. There's an email in the record that explains the reasons for the decision. The more senior employee. Is there something from higher, as I understood it, other offices had the longer hours. Is there a piece of evidence from higher authority saying we want you to expand your hours? This was a decision that was made to make this office consistent with every other office and what they were doing. Was that done by Gross or was it done by whoever's higher up? It was combined. It was not a unilateral decision by Ms. Gross. There's a president of the company, there's the regional manager, Renee Clark, and then Ms. Gross. And she sent an email, Ms. Gross did, explaining in detail the reasons for the decision, and there was not an email in response saying I can't. In fact, when Ms. Way informed Ms. Gross about the devotional, Ms. Way, the plaintiff, said that she would work it, and in fact worked for several more weeks beyond this and testified during her deposition that she never missed her family devotional. And she also acknowledged in her deposition that nobody ever criticized her for her religion, nobody ever made any religious derogatory comments about her being a Christian. She was not even aware of whether the others in the office were or were not Christian. So there's no evidence to support religious harassment. Is there, as I understood the argument, that Aikens had more seniority and picked first? Did Aikens testify to that? She did testify to that, Your Honor, and I think that's important because there is an implication, if not a direct statement, that the plaintiff was assigned a later shift. That's not in fact true. The more senior employee was given an option to go earlier or later, and the more senior employee, who the record does say knew about the family devotionals that she did, she chose the earlier shift. And Ms. Way testified that her devotions are usually done between 6 and 6.30. The record shows that she would have gotten off at 6 under the new shift, and she lives about 10 minutes away. This was a family event as opposed to going to a particular church. Is that correct? That is correct. It was a family event, family devotional, sometimes done before dinner, sometimes after. It wasn't a set time. And I see my time is up if there's more questions. Anything else, Judge? Thank you. Thank you. You have your five minutes for rebuttal. Yes, Your Honor. I'd like to start off with the issue of constructive discharge. It is significantly downplayed by opposing counsel what the actions mean after Ms. Aikens left. Ms. Wade was going to be alone in this office with her tormentor. The gun incident that we've highlighted in the brief, I think, is important here. This was when Defendant Gross went outside and retrieved her firearm. She brought it in and she faced my client and informed her that she was the head bee in charge. She turned to Ms. Aikens, said the same thing. This is the same woman who then continually asks about How long was that before the Aikens left and then before Wade left? I believe it was about a month, month and a half. So it was relatively soon. I can't remember specifically, Your Honor. It was well in advance. Then this erratic woman comes back to the office and starts staring at my client. Against the backdrop of everything else that happened, it's reasonable, if my wife was in that situation, that would be reasonable for her to resign. A reasonable person could find that it is reasonable for that person to resign and they would not tolerate those circumstances, particularly with the harassment with the gun and all of those situations. We're talking about the totality of the circumstances and that's really important. The constructive discharge is a tangible employment action because discharge is in and of itself. So it qualifies under that tangible employment action. So we have two issues. There's change and shift. What's the timing of the gun incident versus the alleged basis for the retaliation? Are you saying the gun incident also happened after the retaliation? It predated the complaint. Okay, that's what I thought. And then there was the complaint to Renee Clark, who is the regional manager. And after that, the more explicit harassment stopped. It shifted in tenor, though. It did not stop entirely. That's when the silent treatment, that's when she started staring at her through the window. And that matters. It's alleged in the complaint. So silent treatment in response to a complaint is sufficient in and of itself. So just to get the timing right, to the extent that you rely on incidents subsequent to the complaints, it's really only the staring and silent treatment because the gun happened before and the comments and the bras and all that happened before. Yes, Your Honor. And it's very important to note, during this time period, Defendant Gross wanted to fire my client, Ms. Wade. And so these actions, she was told by her manager not to. So I think she took it upon herself to create an environment that was so intolerable that her intention would become realized. I'd like to talk about the sexual harassment component, whether she's motive. Were they replaced? I noticed I didn't see something about a kind of a claim based on these people were black, they were replaced by whites. That is not in the record, Your Honor. The sexual attraction component of the sexual harassment. The on-call case talks about explicit and implicit proposals of sexual activity. Defendant Gross discussed hypothetically engaging in a lesbian relationship. She revealed her breasts to my client and to Ms. Aikens. Following that event, she started inquiring as to whether or not my client was wearing underwear, whether she was wearing bras, telling my client that she was not wearing underwear, was not wearing bras. And so that can be implicit. The fact of the matter is sexual orientation does not necessarily remain consistent for someone throughout their life. A reasonable jury could interpret sexual attraction. We are getting hung up a little here because it's same-sex harassment. If this was a typical male, female, female, male harassment case and you presented these facts, a woman revealed her breasts to a man and then started making comments, I don't wear underwear, I don't wear bras, you shouldn't wear briefs or boxers or whatever, it would be very reasonable for a jury to find that that was a sexual attraction. And that's the same thing we're dealing with here. In sum, a reasonable jury could have returned a verdict for my client on each and every claim. And we would appreciate that opportunity to present this to a jury of our peers. Thank you, counsel. The case will be submitted.